IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

MARK HEIN, DEBRA HEIN
and NICK HEIN,

Plaintiffs,

vs.

DEERE & COMPANY,

Defendant.

No. C11-0113

ORDER REGARDING EXPERT
TESTIMONY

## TABLE OF CONTENTS

*I.*   *INTRODUCTION*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.*  *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.* *RELEVANT FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A.*   *Weaver's First Report* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *B.*   *Senneff's Report*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    *C.*   *Weaver's Second Report*  . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    *D.*   *Kvälseth's Report* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*IV.*  *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    *A.*   *Testimony of James M. Weaver* . . . . . . . . . . . . . . . . . . . . . . . 8
        *1.*   *Is Weaver qualified to render an expert opinion in combine design?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        *2.*   *Is Weaver's testimony regarding alternate designs sufficiently reliable?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    *B.*   *Testimony of Tarald O. Kvälseth* . . . . . . . . . . . . . . . . . . . . . 18

*V.*   *ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# I. INTRODUCTION

This matter comes before the Court on the Motion to Strike (docket number 13) filed by the Defendant on April 5, 2013, the Motion to Strike Plaintiffs' New "Rebuttal" Expert Designation and Disclosure (docket number 17) filed by the Defendant on April 30, and the Motion to Exclude Testimony of James Weaver (docket number 21) filed by the Defendant on May 15. Pursuant to Local Rule 7.c, the issues will be decided without oral argument.

## II. PROCEDURAL HISTORY

On October 25, 2011, Mark Hein, Debra Hein, and Nick Hein filed a complaint seeking damages from Deere & Company for injuries sustained to Mark Hein on November 2, 2009. While cleaning the stone trap on a John Deere combine he was operating, Hein's arm was pulled into the "accelerator," resulting in severe injuries and leading to the amputation of his left arm just below the elbow. Plaintiffs allege the combine was defectively designed, and Hein received inadequate instructions and warning. Mark Hein's wife (Debra Hein) and his son (Nick Hein) seek damages for loss of consortium and for negligent infliction of emotional distress. Deere answered the complaint on November 29, 2011, denying the material allegations.

On January 12, 2012, the Court adopted a Scheduling Order and Discovery Plan submitted by the parties. Among other things, the parties agreed to deadlines for the disclosure of expert witnesses and completion of discovery. On joint application by the parties, the deadline for completion of discovery was extended to April 15, 2013, with a May 15 dispositive motions deadline. The trial ready date is September 15, 2013.

## III. RELEVANT FACTS

On June 15, 2012, Plaintiffs timely produced a report from their expert witness, James Michael Weaver, a registered mechanical engineer. On September 14, 2012, Deere

timely produced a report by its expert, Michael D. Senneff. On March 22, 2013, Plaintiffs produced a "supplemental report" from its expert, Mr. Weaver.

On April 5, 2013, Deere filed its first motion to strike. Deere argues that the supplemental report does not simply supplement Weaver's initial opinions, but instead constitutes "a new report in an attempt to backfill deficiencies in his first report."[1] Plaintiffs maintain, however, that "the supplemental report of Weaver is merely a demonstration of the opinions expressed in his original report."[2] Plaintiffs further argue that Deere has suffered no prejudice as a result of the timing of Weaver's supplemental report.

Deere filed its first motion to strike on April 5, 2013. Briefing on the first motion was completed with Deere's reply on April 26. Meanwhile, on April 24, Plaintiffs served Deere with a "rebuttal report" by Tarald O. Kvälseth, Ph.D. Deere responded with a second motion to strike, arguing that the rebuttal report is not timely and is simply "an after-the-fact, blatant attempt to bolster Weaver's initial, incomplete opinions, and is yet another attempt by Plaintiffs to cure deficiencies in Weaver's first report."[3] Plaintiffs contend that Kvälseth's opinions are "in direct response and rebuttal" to the opinions expressed by Deere's expert, Mr. Senneff.[4]

On May 15, 2013, Deere filed a third motion regarding expert testimony, this time asking that Plaintiffs' original expert, Mr. Weaver, be prohibited from testifying altogether. Deere claims that Weaver lacks expertise in the design of combines, his

---

[1] Deere's Brief (docket number 13-4) at 8.

[2] Plaintiffs' Brief (docket number 14-1) at 1.

[3] Deere's Motion to Strike (docket number 17) at 2, ¶ 7.

[4] Plaintiffs' Resistance (docket number 23) at 1, ¶ 2.

methodology was flawed, and his proposed alternative designs fail to meet a *Daubert* challenge. Plaintiffs resist, citing Weaver's "decades of experience" as a mechanical engineer.

### A. Weaver's First Report

On June 15, 2012, Plaintiffs timely served a report from their expert, James M. Weaver. The report is in the form of a letter from Weaver to one of Plaintiffs' attorneys, dated March 27, 2012.[5] After examining the combine and investigating the circumstances of Hein's injury, Weaver concluded that the combine, "as designed and manufactured, was unreasonably dangerous to the operator when the stone trap was cleaned."

The "deficiencies and defects" observed by Weaver included:

- The two yellow engagement switches have very short travel between the ON and OFF positions and their position can be confusing.

- The yellow engagement switch on the left automatically switches to the OFF state when the operator leaves the seat, while the right yellow engagement switch does not, a confusing arrangement for the operator.

- The combine has no alarm system to warn the operator that the Feed Accelerator cylinder continues to rotate when the operator leaves the seat with the engine running.

- The warning label provided on the right side of the combine did not properly indicate that the Feed Accelerator cylinder could still be rotating after the Header stopped automatically.

---

[5] Weaver's report was attached to two of Deere's motions as Exhibit A (docket numbers 13-1 and 21-1). The first page of the report is dated March 27, 2012, while the remaining pages are all dated June 12, 2012.

o  The warning label provided on the right side of the combine admonished the operator to insure that the Feed Accelerator was stopped before cleaning the stone trap. However, the stone trap was frequently packed with harvest debris, preventing Mr. Hein from observing the motion of the Feed Accelerator.

o  The stone trap was not equipped with any type of switch or sensor to alert Mr. Hein that he was about to open the stone trap door with the Feed Accelerator cylinder spinning inside.

Weaver's First Report (docket number 13-1) at 14.

In addition to identifying design deficiencies and defects, Weaver suggests certain "alternate designs":

Several alternate designs have been considered to significantly reduce the probability of injury when cleaning the stone trap.

First, as the header on the subject combine was already designed to stop within 5 seconds after the combine operator left his seat, the separator and Feed Accelerator could be connected to the same system. This would bring the separator and Feed Accelerator to a stop if the operator left the seat.

However, this modification would not stop the Feed Accelerator cylinder if a second worker attempted to remove debris while the operator was seated. A second design considered was the addition of a proximity switch to the stone trap door actuation lever. If the Stone Trap door actuation lever is moved when the Separator Engage switch is in the ON position, a horn and/or flashing strobe light could be activated to warn the operator or worker of the severe potential hazard of opening the Stone Trap door.

If operating components continue to move after the Separator Engage switch is moved to the OFF position, a time delay circuit could be added. For example, if one minute of time is

needed for all components to coast to a stop, moving the Separator Engage switch to the OFF position would start a one-minute timer. If the Stone Trap door actuation lever was moved during the one minute period, an alarm would be sounded to warn that components were still moving.

Finally, an electromechanical solenoid could be installed on the stone trap door lever to lock the stone trap door whenever the separator and Feed Accelerator are rotating.

Weaver's First Report (docket number 13-1) at 11-12.

## B. Senneff's Report

On September 14, 2012, Deere timely served Plaintiffs with a report from its expert, Michael D. Senneff.[6] Senneff opined that Weaver's opinions were "incorrect, not supported by the evidence or by sound practices of combine design, and speculative."[7] Senneff also notes that in proposing alternate design features, Weaver "provided no data of any sort to indicate that their design proposals have been tested and evaluated either in the field or the laboratory for reliability, functionality, production efficiency and customer satisfaction and acceptance if incorporated into the design of the 9560 STS combine."[8] After responding to the alleged design defects identified in Weaver's report, Senneff goes on to discuss in detail the problems associated with Weaver's alternate designs.[9]

---

[6] Senneff's Report, dated September 13, 2012, was attached to Deere's motions as Exhibit B (docket numbers 13-2 and 21-2).

[7] Senneff's Report (docket number 13-2) at 1.

[8] *Id.* at 2.

[9] *Id.* at 18-23.

### C. Weaver's Second Report

On March 22, 2013, Plaintiffs served Deere with Weaver's "supplemental report."[10] The second report "was prepared to document the design, fabrication and testing of an enhanced safety system suitable for installation" on the subject combine.[11] Weaver referred to his initial report, where he noted that "the Feed Accelerator could only be stopped by manually operating a switch on the instrument panel or by turning off the engine."[12] After opining that this design had "several serious deficiencies," Weaver then describes an "enhanced safety system" designed to address the alleged defects in the combine. Specifically, Weaver describes a horn and strobe light which would be activated if a proximity detector determined "the Feed Accelerator cylinder was turning at greater than 4 revolutions per minute (4 rpm) while the Stone Trap door was open." Weaver opines that the enhanced safety system could be incorporated in the design of the combine for a modest cost. A "demonstration system" was tested, as shown on a DVD attached to the Second Report as Appendix A.

### D. Kvälseth's Report

On April 24, 2013, Plaintiffs served Deere with a report from Tarald O. Kvälseth, Ph.D., dated the same day.[13] Dr. Kvälseth has degrees in mechanical engineering and industrial engineering, with an emphasis in "human factors and safety engineering." According to his report, Kvälseth's opinions "are offered as rebuttal to those of the defense

---

[10] Weaver's Second Report, dated February 28, 2013, was attached to Deere's Motion to Strike as Exhibit C (docket number 13-3).

[11] *Id.* at 1.

[12] *Id.* at 2.

[13] Kvälseth's Report was attached to Deere's Second Motion to Strike as Exhibit A (docket number 17-2).

expert, Mr. Michael Senneff."[14] Kvälseth enumerates Senneff's various opinions, and then responds to each in turn.

## IV.  DISCUSSION

In its initial motion to strike, Deere asked that Plaintiffs' expert, James M. Weaver, be prohibited from testifying regarding those opinions set forth in his second report.  Deere subsequently filed a second motion regarding Weaver's testimony, asking that it be excluded altogether.  Deere also asks that Plaintiffs be prohibited from offering the testimony of their other expert, Tarald O. Kvälseth, asserting that it is not true rebuttal testimony.

### A.  Testimony of James M. Weaver

### 1.    Is Weaver qualified to render an expert opinion in combine design?

Deere asks the Court to exercise its "gatekeeping" responsibility by prohibiting Weaver from testifying.  FEDERAL RULE OF EVIDENCE 104(a) states that "[p]reliminary questions concerning the qualification of a person to be a witness . . . shall be determined by the court."  In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 (1993), the Court instructed that when "[f]aced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999), the Court made it clear that Daubert's "gatekeeping" obligation applies not only to "scientific" knowledge, "but also to testimony based on 'technical' and 'other specialized' knowledge."

---

[14] *Id.* at 1.

FEDERAL RULE OF EVIDENCE 702, which was amended in response to *Daubert* and *Kumho*, governs the admissibility of testimony by expert witnesses.[15] Rule 702 requires, preliminarily, that the witness be "qualified as an expert." If a witness is qualified as an expert by virtue of his knowledge, experience, training, or education, then he may testify in the form of an opinion if the testimony (1) will help the jury to understand the evidence or to determine a fact in issue, (2) is based on "sufficient" information, (3) is the product of "reliable principles and methods," and (4) the witness has "reliably applied the principles and methods to the facts of the case." Here, Deere argues that Weaver is not qualified to give expert testimony regarding the design of farm equipment, and that Weaver's proposed testimony regarding alternative designs lacks the "reliability" required by *Daubert*, *Kumho*, and Rule 702.

Mr. Weaver received a bachelor of mechanical engineering degree from Cleveland State University in 1972, and has 15 hours of graduate mechanical engineering studies and 14 hours of undergraduate electrical engineering studies from the University of Colorado in Denver.[16] A summary of Weaver's "consulting/design experience," found on his resume, states that he has been active as a mechanical engineer since 1972 in the areas of

---

[15] "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

  (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

  (b)   the testimony is based on sufficient facts or data;

  (c)   the testimony is the product of reliable principles and methods; and

  (d)   the expert has reliably applied the principles and methods to the facts of the case."

FED. R. EVID. 702.

[16] Resume of James Michael Weaver (docket number 21-1 at 41-42).

air pollution, noise control, power generation equipment, energy studies, chilled water systems, heating systems, overhead transmission lines, and waste incinerators. He also served as facility mechanical engineer for the analysis of chilled water performance and indoor air pollution issues. Since 2008, Weaver has been "active as Professional Engineer in forensic analyses and documentation." The resume makes no reference to farm machinery or other heavy equipment.

In support of its argument that Weaver is not qualified to render an opinion regarding combine design, Deere cites *Anderson v. Raymond Corp.*, 340 F.3d 520 (8th Cir. 2003), and *Dancy v. Hyster Co.*, 127 F.3d 649 (8th Cir. 1997). In *Anderson*, the plaintiff was injured when she was ejected from a stand-up power lift truck. The defendant moved to strike the plaintiff's expert because he "was not an expert in lift truck design, and his unreliable testimony would not assist the jury." 340 F.3d at 522. The witness admitted that he was not an expert in the design or engineering of stand-up lift trucks, had never designed or consulted on a design of a stand-up lift truck, had never designed a component part or a warning for a stand-up lift truck, and "had neither operated nor seen a stand-up lift truck before this case." *Id.* at 523. The district court concluded that the witness was not qualified as an expert for Anderson's case, and granted the motion to strike. *Id.* The Eighth Circuit Court of Appeals affirmed.

In *Dancy*, the plaintiff was also injured by a lift truck. The plaintiff designated as his expert witness a mechanical engineer, who had "never designed a fork lift, a lift truck, or any other similar machine; his specialty is in the field of thermal science." 127 F.3d at 651. The witness opined that the lift truck should have had a guard to keep Dancy's leg within the lift truck's frame. However, the witness "had not tested this theory in any way, had not seen this type of device on a fork lift or any other similar machine, and had not

even designed the device he suggested would have prevented Plaintiff's injury." *Id.* The Eighth Circuit Court of Appeals concluded that "the district court was justified in questioning the reliability and usefulness of Dr. Forbes's testimony," and did not abuse its discretion in disallowing the testimony. *Id.* at 652.

Here, Weaver testified at his deposition that he moved to Iowa in 2004 and worked as a facility mechanical engineer for a manufacturing company in Story City. In 2008, Weaver began working with Hall-Wade Engineering Services. Two years ago, he became a co-owner of the business and it was renamed Ames Forensic Engineers. Weaver estimated that 98% of his professional time is related to litigation issues. Prior to living on his wife's family farm, Weaver did not have any farming background and did not receive any education or training in agricultural engineering. Weaver testified that he rode on a combine once, but has never operated, serviced, or maintained one. According to Weaver, Hall-Wade Engineering Services was involved in the investigation of a number of combine fires, but it was not required to do any engineering study on the "front end operation" of a John Deere combine. Prior to this litigation, Weaver had never had an occasion to research the design of the rock trap feature of the combine involved in Hein's accident, or any other combine. Weaver testified that he considered himself to be "an expert mechanical engineer with also heavy emphasis in electrical engineering," but conceded that he did not consider himself to be an "agricultural engineer." Weaver does not belong to any societies or professional groups that focus specifically on agricultural engineering issues, and prior to this litigation he did not have any reason to "study or become familiar with published safety standards applicable to agricultural harvesting equipment."[17] While Weaver testified that "I have the expertise to render an opinion on

---

[17] When asked if he was a member of any professional engineering society, Weaver responded that he is a member of the National Fire Prevention Association.

11

mechanical systems, safety equipment, and electronic controls," he conceded that he has "no specific experience in the design of new agricultural equipment." Prior to rendering an opinion in this case, Weaver did not undertake any "historical review" of the design history of the combine involved.

In his initial report, Weaver proposed four possible alternate designs to improve the safe operation of the combine.[18] Weaver acknowledged at his deposition on April 4, 2013, that when he wrote the initial report, he "had not done any specific work with respect to incorporating any one of those potential design features into a 9560; that is, [he] hadn't done any engineering drawings or actually done any testing of any such system for this combine at that time." Weaver also testified that work on an alternative design involving a warning system consisting of a strobe light and horn was "ongoing." According to Weaver, he has "a working demonstration system," which is available to be installed on a combine. Weaver admitted, however, that he had not drafted a test protocol, but testified he would do so prior to installation.

Deere argues that having a degree in mechanical engineering and riding once in a combine does not qualify one to give an expert opinion about combine design. The Court agrees. Like the proposed experts in *Anderson* and *Dancy*, who had little experience with the lift trucks at issue, Weaver has no prior experience in the design of combines, or other similar equipment. He also has no training or education in the design or operation of a combine or other agricultural equipment. Until becoming employed in the area of forensic

---

[18] The first alternate connects the separator and feed accelerator to the same system which stops the header within five seconds after the combine operator leaves his seat. The second alternative activates a horn and/or flashing strobe light when the stone trap door is opened with the separator engage switch on. A third alternative is similar, but the alarm would be activated if the switch is "off," but the components were coasting to a stop. Finally, Weaver suggests that the stone trap door could be designed to remain locked whenever the separator and feed accelerator are rotating.

engineering in 2008, Weaver's expertise apparently involved primarily heating, cooling, and environmental engineering. While Weaver and his partner apparently investigated combine fires, it did not require any investigation or analysis of the "front end" operation of the combine. The entirety of Weaver's expertise regarding combine design was gained *after* being retained by Plaintiffs to render an opinion in this case. Not only does Weaver lack experience with combines or other similar equipment, there is no indication in this record that he has *ever* designed a "safety system" or warning device for *any* heavy machinery or equipment. The Court does not believe that Weaver's knowledge, skill, experience, training, and education qualify him as an expert in combine design.[19] *Compare Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 685 (8th Cir. 2001) (finding the trial court erred in excluding the testimony of an expert who had testified in approximately 40 pneumatic nail gun cases).

### 2. Is Weaver's testimony regarding alternate designs sufficiently reliable?

Even if Weaver is otherwise qualified to render expert opinions regarding combine design, the Court believes that his proposed testimony regarding an alternate design fails for other reasons. FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B)(i) provides that an

---

[19] The Court notes parenthetically that it recently found Mr. Weaver qualified to render expert opinions regarding an alleged defect in the condition of a motorcycle. *Boddicker v. American Honda Motor Co., Inc.*, 2011 WL 5101912 (N.D. Iowa 2011). There, the defendant moved to exclude Weaver's testimony, asserting he was not qualified to render an expert opinion regarding alleged defects in a motorcycle, and that his opinions were not reliable or trustworthy. In finding Weaver qualified as an expert witness, the Court noted that he had substantial experience in operating motorcycles and claimed that he was "an experienced motorcycle mechanic and has substantial knowledge in the operation of motorcycles." *Id.* at *7. Conversely, Weaver concedes in this case that he has no prior experience with agricultural equipment, and has never operated or maintained a combine.

expert witness disclosure must be accompanied by a written report containing "a complete statement of all opinions the witness will express and the basis and reasons for them." In his initial report, Weaver opined that the combine was defectively designed, and suggested various alternate designs. The report provided no details, however, regarding how the alternate designs would be incorporated on the combine, or how they may affect functionality. In *Pestel v. Vermeer Mfg. Co.*, 64 F.3d 382 (8th Cir. 1995), the Court rejected the proposed testimony of an expert who "came up with a design concept" for a guard on a stump cutter machine. *Id.* at 383. The Court concluded that the testimony was not relevant because the expert had never used a stump cutter, did not consult with any stump-cutter operators to determine how his design would work in the field, did not test his fabricated guard, and admitted that he would not use the guard in its present state. *Id.* at 383-84. The expert had not contacted others in the industry to see if they had attempted to create a similar type of guard, nor had he "subjected his concept to any manufacturers, academicians, or engineering professors, for scrutiny." *Id.* at 384. Applying the *Daubert* criteria, the Court concluded that "the testimony was not scientifically valid and would not aid the jury in its fact finding." *Id.* Similarly, the alternate designs identified by Weaver in his first report were merely "design concepts."

In exercising its gatekeeper role and determining whether the proffered testimony is reliable and relevant, the Court may consider a number of factors.

> When making the reliability and relevancy determinations, a district court may consider: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community.

*Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012) (citing Daubert, *509 U.S.* at 593-94). Other factors include "whether the expertise was developed for litigation or naturally flowed from the expert's research." *Lauzon*, 270 F.3d at 687. "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands." *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005).

Plaintiffs argue that details regarding Weaver's proposed "enhanced safety system" are found in his second report. There, Weaver describes the "horn and strobe light" alternative in more detail, and an accompanying DVD shows the component parts — with an electric fan playing the role of the accelerator found on the combine — hooked up on a table. Deere argues that the second report is too little and too late.

Expert witnesses are permitted and, in fact, required to supplement expert witness disclosures. *See* FED. R. CIV. P. 26(e). Rule 26(e) is not intended, however, as a vehicle to shore up previous opinions.

> A supplemental expert report that states additional opinions or rationales or seeks to "strengthen" or "deepen" opinions expressed in the original expert report exceeds the bounds of permissible supplementation and is subject to exclusion under Rule 37(c)(1). To rule otherwise would create a system where preliminary expert reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could "supplement" existing reports and modify opinions previously given. This result would be the antithesis of the full expert disclosure requirements stated in Rule 26(a).

*Cohlmia v. Ardent Health Services, LLC*, 254 F.R.D. 426, 433 (N.D. Okla. 2008); *Beller v. United States*, 221 F.R.D. 696, 701 (D.N.M. 2003) (same). *See also Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998) ("Supplementation under the Rules means

correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure.").

In his initial report, Weaver refers in passing to four alternate designs, including "a horn and/or flashing strobe light" which would be activated if the stone trap door was opened with the Separator Engage switch on. It was not until nine months later, however, and six months after Deere produced its expert's report, that Weaver identified his preferred alternate design and provided any detail in that regard.[20] The Court finds it unnecessary to determine whether Weaver's second report is an appropriate "supplemental" report, however, because the proposed testimony of an alternate design fails to meet the reliability requirement of *Daubert*, *Kumho*, and Rule 702.

The Court recognizes that Rule 702 "is one of admissibility rather than exclusion." *Lauzon*, 270 F.3d at 686 (quoting *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir. 1991)). As noted by the Court in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596. Nonetheless, "the proponent of the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." *Marmo v. Tyson Fresh Means, Inc.*, 457 F.3d 748, 757-58 (8th Cir. 2006) (citing *Daubert*). Even *if* the Court found that Weaver is an expert in combine design or safety features on heavy machinery or equipment, and even *if* his opinions regarding an alternate design had been disclosed

---

[20] In his second report, Weaver suggests that not only would a horn and/or flashing strobe light be activated if the stone trap door was opened with the Separator Engage switch on, but in that event power would also be cut to the accelerator. This appears to be a modification of Weaver's second alternate design.

timely, his opinions regarding the horn and strobe light alternative fail the *Daubert* standard.

The Court recognizes that experts are not required to manufacture a new device or prototype in order for their opinion to be admitted, but Weaver did not prepare any drawings or other designs showing how his concept could be successfully integrated into the design of this combine. *Unrein*, 394 F.3d at 1012. While Weaver prepared a simple demonstration using substitute components, his design concept was not tested in any meaningful way, and he had no plans to test it. *Pestel*, 64 F.3d at 384. Nothing in the record suggests that Weaver had contacted others in the industry to see if they had attempted to create a similar warning, and "[h]e had not subjected his concept to any manufacturers, academicians, or engineering professors, for scrutiny." *Id.* *See also Wagner v. Hesston Corp.*, 750 F.3d 756, 758-59 (8th Cir. 2006) (excluding the testimony of two experts based on "minimal testing," "slim evidence of peer review," and the lack of evidence that the alternative design would work in the field). In *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076 (8th Cir. 1999), the plaintiff proffered expert testimony that Deere's corn head was defectively designed. The Court found that the district court properly excluded the proposed testimony.

> [Plaintiff's expert] has not attempted to construct or even draw the suggested device, much less test its utility as a safety device or its compatibility with the corn head's proper function. Nor has he pointed to any manufacturer that incorporates awareness barriers into corn heads or similar farming machinery. In short, he has provided no basis for us to believe that his opinions are anything more than unabashed speculation. We therefore hold that the district court did not abuse its broad discretion in concluding that the proffered testimony regarding the lack of awareness barriers flunked the reliability prong of *Daubert*.

*Id.* at 1084.

In summary, the Court concludes that Weaver is not qualified by virtue of his knowledge, experience, training, and education, to testify as an expert in the design of farm combines. Even if Weaver were otherwise qualified as an expert in this area, however, the Court finds that his opinions regarding a proposed alternate design fail to meet the reliability requirements of *Daubert*, *Kumho*, and Rule 702. Given the Court's conclusions in this regard, it is unnecessary to reach the issues of whether Weaver's second report is truly "supplemental," or instead sets forth substantially new opinions, and whether Deere is prejudiced by the timing of Weaver's second report.[21]

### B. Testimony of Tarald O. Kvälseth

On April 24, 2013, Plaintiffs served Deere with a report from Tarald O. Kvälseth. If permitted to do so, Plaintiffs intend to call Kvälseth as a witness at trial, to rebut the opinions of Michael Senneff, Deere's expert witness. Deere argues that Kvälseth is not

---

[21] Plaintiffs argue that an untimely supplemental expert report should not be stricken unless prejudice resulted to the other side, citing *Dunning v. Bush*, 536 F.3d 879 (8th Cir. 2008). There, the district court struck the supplemental report because "it was not a supplemental report within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 26(e)" and the defendants would be prejudiced by the plaintiff's attempt to "interject a brand new, previously undisclosed opinion" less than three months before trial and after the defendants had moved for summary judgment. *Id.* at 889. The Court of Appeals reversed. I believe, however, that *Dunning* is distinguishable from the instant action. In *Dunning*, the expert stated in his initial report that the value of a certain agreement was understated due to an excessive discount rate and the failure to reflect cement price increases. "His report noted, however, that a precise value for the Cement Supply Agreement would be determined when more information was available." *Id.* Fifteen days after the additional information was provided, the expert produced a supplemental report, specifically valuing the Agreement. In the instant action, however, Weaver was not waiting for any additional information from Deere before finalizing his calculations. Instead, the facts underlying the opinions expressed in Weaver's second report — submitted more than nine months after his first report — were available to him during his initial investigation.

truly a "rebuttal" witness and, therefore, he should not be permitted to testify.[22] Deere claims that a rebuttal witness may only be used to respond to "new" information raised by Deere's expert. Plaintiffs respond that "[r]ebuttal testimony is not necessarily predicated on new or additional evidence."[23] In reply, Deere states that "Plaintiffs are wrong."[24]

In support of their respective positions, both parties cite *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748 (8th Cir. 2006). There, the Court granted the defendant partial summary judgment because the plaintiff failed to proffer admissible expert testimony to demonstrate causation with regard to a permanent physical injury. *Id.* at 757. The plaintiff initially identified Dr. Kilburn as an expert to render an opinion on medical causation. After the defendant filed a motion for summary judgment and a motion *in limine* challenging the reliability of Dr. Kilburn's opinion, however, the plaintiff withdrew Dr. Kilburn as an expert. The plaintiff then proffered the testimony of Dr. Ammann and Dr. Meggs.[25] *Id.* The district court refused to allow the plaintiff to call Dr. Meggs as a witness in her case-in-chief, finding he was not designated timely. *Id.* at 759. The appellate court concluded the district court did not abuse its discretion in that regard. *Id.* at 760.

The plaintiff also claimed Dr. Meggs' expert testimony was "necessary to refute the disclosed opinions" of the defendant's expert witness, and the Eighth Circuit Court of Appeals concluded that the district court "properly construed Dr. Meggs as a rebuttal

---

[22] Deere does not challenge Kvälseth's qualifications as an expert in this area.

[23] Plaintiffs' Brief (docket number 23-1) at 3.

[24] Deere's Reply (docket number 24) at 1.

[25] The district court refused to allow Dr. Ammann to testify regarding causation, finding the testimony did not meet the reliability standard established in *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993).

witness." *Id.* at 759. Nonetheless, because the defendant did not present evidence on medical causation, the district court properly refused to allow Dr. Meggs to testify because "there was no evidence for Dr. Meggs to rebut." *Id.* at 760.

In discussing these issues, the Court described the role of rebuttal evidence:

> "The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party." *United States v. Lamoreaux*, 422 F.3d 750, 755 (8th Cir.2005) (citation omitted); *Faigin v. Kelly*, 184 F.3d 67, 85 (1st Cir.1999) ("The principal objective of rebuttal is to permit a litigant to counter new, unforeseen facts brought out in the other side's case.") (citations omitted). As such, rebuttal evidence may be used to challenge the evidence or theory of an opponent-and not to establish a case-in-chief. *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir.1991) ( "Rebuttal must be kept in perspective; it is not to be used as a continuation of the case-in-chief."); *see also* John Henry Wigmore, *Evidence in Trials at Common Law* § 1873 (1976) (a district court should allow rebuttal evidence only if it is necessary to refute the opponent's case).

*Id.*

In arguing that Kvälseth is not a proper rebuttal witness, Deere seizes on the language referring to "new, unforeseen facts brought out in the other side's case."[26] Deere argues that its expert, Michael Senneff, simply responded to opinions expressed by Plaintiffs' initial expert, James Weaver, and did not identify any "new or unforeseen facts." On the other hand, in arguing that rebuttal testimony is not necessarily predicated on new or additional evidence, Plaintiffs focus on the language in *Marmo* stating that

---

[26] Deere's Reply (docket number 24) at 1.

"[t]he function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party."[27]

"Normally, parties are expected to present all of their evidence in their case in chief." *Gossett v. Weyerhaeuser Co.*, 856 F.2d 1154, 1156 (8th Cir. 1988) (quoting *Smith v. Conley*, 584 F.2d 844, 846 (8th Cir. 1978)). Depending upon the circumstances of the case, however, the Court may allow a party to present additional evidence on rebuttal. *Id.* Rebuttal evidence "is offered to explain, repel, counteract, or disprove evidence of the adverse party." *United States v. Jean-Guerrier*, 666 F.3d 1087, 1092 (8th Cir. 2012) (quoting *United States v. Harris*, 557 F.3d 938, 942 (8th Cir. 2009)).

Like the plaintiff in *Marmo*, it is too late for Plaintiffs here to designate Kvälseth as an expert witness to be used during their case-in-chief. Indeed, Plaintiffs do not argue that Kvälseth should be permitted to testify during Plaintiffs' case-in-chief. Rather, Plaintiffs ask that Kvälseth be permitted to testify to refute the testimony of Deere's expert witness.[28] A rebuttal witness may not be used to bolster testimony offered by a plaintiff in its case-in-chief. Rather, rebuttal testimony may only respond to evidence offered by the defendant. *Benedict v. United States*, 822 F.2d 1426, 1429 (6th Cir. 1987) (distinguishing between evidence offered "to reinforce [the plaintiff's] initial premise" and testimony which was "real rebuttal evidence"). The scope of rebuttal testimony is limited to that "which is directed to rebut new evidence or new theories proffered in the defendant's case-in-chief." *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 345 (6th Cir. 2002). Evidence is "new" for rebuttal purposes if the evidence "was not fairly and adequately presented to the trier of fact before the defendant's case-in-chief." *Id.* (citing *Benedict*).

---

[27] Plaintiffs' Resistance (docket number 23) at 3.

[28] "Kvälseth's report is intended to rebut the opinions of Senneff and not intended to prove Plaintiffs' case in chief." Plaintiffs' Brief (docket number 23-1) at 19.

If Weaver testified at trial and Senneff only responded to Weaver's testimony, without adding anything "new," then it may be that Kvälseth's opinions would not be "real rebuttal evidence," and Kvälseth would not be a proper rebuttal witness. As set forth above, however, the Court has concluded that Plaintiffs' initial expert witness, James Weaver, will not be permitted to testify at trial. In his report, Kvälseth painstakingly responds point-by-point to each of Senneff's opinions. *If* Senneff testifies at trial, then his testimony on these issues will be "new" — *i.e.*, not in response to expert testimony offered by Plaintiffs — and Kvälseth will be permitted to rebut Senneff's opinions. The scope of Kvälseth's testimony will be limited by the scope of Senneff's testimony. If Senneff *does not* testify at trial, however, then there will be nothing to rebut and Kvälseth will not be permitted to testify.

The Court has not disregarded the fact that Kvälseth was not identified as a rebuttal expert witness until more than five months after the deadline established by the Court for doing so. The Scheduling Order required disclosure of Plaintiffs' rebuttal experts, if any, not later than November 15, 2012. Apparently, however, the parties agreed informally, and without seeking a court order modifying the Scheduling Order, to extend the deadline until after the deposition of Deere's expert witness. Because of "scheduling issues," Mr. Senneff's deposition was not taken until April 10, 2013. Kvälseth was identified as a rebuttal expert on April 24. Under these circumstances, Deere cannot claim that disclosure of the rebuttal expert was untimely.

## V. ORDER

IT IS THEREFORE ORDERED as follows:

1.     The Motion to Strike (docket number 13) and the Motion to Exclude Testimony (docket number 21) filed by the Defendant are **GRANTED**. Plaintiffs will not be permitted to call James Weaver as an expert witness at the time of trial.

2. The Motion to Strike Rebuttal Expert Designation (docket number 17) filed by Defendant is **DENIED**. If Defendant calls Michael Senneff as an expert witness at the time of trial, then Plaintiffs may call Tarald O. Kvälseth to rebut Senneff's testimony.

DATED this 22nd day of July, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA